**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **MICHAEL DERRICK EDWARDS,** ) | | |
| Plaintiff, ) | | CASE NO. 7:19CV00324 |
| ) | | |
| v. ) | | MEMORANDUM OPINION |
| ) | | |
| **BARRY KANODE, ET AL.,** ) | | By:  Hon. Glen E. Conrad |
| Defendants. ) | | Senior United States District Judge |

In this civil rights action under 42 U.S.C. § 1983, plaintiff Michael Derrick Edwards, a Virginia Department of Corrections ("VDOC") inmate proceeding pro se, alleges that defendants Beverly Witt, a registered nurse ("RN"), and Deborah Ball, a nurse practitioner ("NP"), acted with deliberate indifference to his serious medical needs.  After review of the record, the court concludes that the motion for summary judgment filed by NP Ball and RN Witt must be denied in part and granted in part.

I.

Edwards alleges that on November 27, 2018, at River North Correctional Center ("River North"), he was involved in an altercation with prison officials, who engaged a patrol dog that bit him in several places.  After maintaining Edwards in restraints all night, on the morning of November 28, 2018, the River North doctor examined Edwards, who was then transported to Red Onion State Prison ("Red Onion").  Edwards alleges that when he arrived at Red Onion around 12:30 p.m., "the entire left side of his face and head was bruised, bloody, swollen, his left eye was completely swollen closed, [he] had a cut on his right eyebrow, cuts, bruises and swelling to both hands and wrists, both lips busted and dog bites on right leg, thigh, and back."  Second Amend. Compl. ("Compl.") 7, ECF No. 126.  Edwards claims that defendants NP Ball and RN Witt acted with deliberate indifference by denying him adequate medical care for some of these conditions for nearly four months.

Defendants NP Ball and RN Witt have filed a motion to dismiss on the ground of qualified immunity and a motion for summary judgment, supported by affidavits and medical records.[1] Edwards has responded, making these matters ripe for disposition.

## II.

### A.

A court should grant summary judgment only when the pleadings and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. Id. at 255. "Because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the court's inquiry on summary judgment must be "whether the evidence in this case presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014).[2]

---

[1] The court notes that because the defendants' motion to dismiss on the ground of qualified immunity relies on evidence outside the pleadings, offered in support of their summary judgment motion, the court finds the motion to dismiss to be subsumed into the separate motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Moreover, because the court herein finds material facts in dispute as to NP Ball, her qualified immunity defense cannot be decided at this stage of the proceedings. See Willingham v. Crooke, 412 F.3d 553, 559 (4th Cir. 2005) (holding genuine question of material fact related to reasonableness of official's action or inaction precludes summary judgment on qualified immunity grounds).

[2] The court has omitted internal quotation marks, alterations, and/or citations here and throughout this memorandum opinion, unless otherwise noted.

To state a claim under § 1983,[3] a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). An inmate's Eighth Amendment protections against cruel and unusual punishment include a right to the medical care necessary to address his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 103-04 (1976). Specifically, a prison official's "deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014).

The first, medical need portion of this legal standard is objective. It requires showing that the inmate's medical condition is, objectively, "serious—one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. A medical condition is "objectively serious when it would result in further significant injury or unnecessary and wanton infliction of pain if not treated." Formica v. Aylor, 739 F. App'x 745, 755 (4th Cir. 2018).

The second, deliberate indifference portion of the Eighth Amendment standard is subjective. The plaintiff must show, by direct or circumstantial evidence, that each defendant, subjectively, knew of and disregarded an excessive risk to inmate safety or health. Farmer v. Brennan, 511 U.S. 825, 837 (1994). The evidence must support findings that each defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and that she "also dr[e]w the inference." Id. While the inmate need not show the prison official "acted or omitted to act for the very purpose of causing harm or with knowledge that harm will result," the inmate must show "more than mere negligence." Id. at 835. Similarly, an inmate's mere disagreement with "questions of medical judgment" as to the appropriate care for the

---

[3] Although the introduction of Edwards' complaint mentions state tort claims, the only specific tort claim he describes in the pleading is assault and battery by officers involved in the altercation at River North.

plaintiff's condition will not support a finding of deliberate indifference. See Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975). An inmate has no "constitutional right to the treatment of his choice," so long as the medical treatment provided was "adequate to address the prisoner's serious medical need." De'lonta v. Johnson, 708 F.3d 520, 526 (4th Cir. 2013); Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977) (holding that essential test for constitutionally required medical care "is one of medical necessity and not simply that which may be considered merely desirable").

B.

The parties mostly agree on the sequence of events related to Edwards' requests for medical attention and the medical examinations, tests, referrals, and treatment provided to him at Red Onion. See gen. Mem. Supp. Mot. Summ. J., ECF No. 109. The doctor at River North prescribed the antibiotic medication Augmentin and recommended follow up for possible delayed signs of head injury. On November 28, 2018, at Red Onion, NP Ball ordered Augmentin, twice per day for ten days, and follow up evaluation of a possible head injury and other injuries received at River North. See id. Ex. 2, Ball Decl. ¶ 26 and Attach. at 35, ECF No. 109-2.

On the morning of November 29, 2018, NP Ball performed a medical assessment on Edwards. She noted that he was able to open his mouth without difficulty; his left upper eyelid was swollen and subconjunctival hemorrhage was visible in both eyes; his right hand was swollen, and he exhibited decreased range of motion in that hand; he had a one-centimeter closed laceration on his right eyebrow area; his pupils were equal, round, and reactive to light and accommodation; and the range of motion in his arms and legs was within normal limits. She recorded that Edwards denied having any abdominal pain or problems with the skin on his lower extremities. NP Ball also noted that Edwards "had no vision changes per [his] report." Ball Decl. Attach. at 36. She ordered an X ray of Edwards' right hand and an X ray of his facial bones because of the bruising of his mid lower eye orbits, swelling of his left upper eyelid, and the presence of subconjunctival

4

hemorrhages. Finally, NP Ball reported that no acute neuro deficits were present and that Edwards was to elevate his right hand as needed.

X rays of Edwards' right hand and facial bones were performed on December 4, 2018. On December 6, 2018, NP Ball reviewed and signed off on the hand X ray report, which found no acute fracture or dislocation and no focal soft tissue findings. On December 13, 2018, NP Ball signed off on the facial X ray report, which found no definite or displaced facial fracture. The report noted, however, that "[p]lain films cannot evaluate intracranial pathology, CT if concern." Ball Decl. at ¶¶ 29, 31. The record does not indicate that NP Ball ordered any follow up examinations or prescribed any further treatment for Edwards for more than two months.

Edwards' evidence is that when NP Ball examined him on November 29, 2018, some unspecified injuries were still bleeding and swollen, but she offered no medical care other than ordering X rays. He states that he told her he had pain throughout his body from being in restraints so long, that "his hands and wrists were giving him pain and numb of feeling along with the dog bites, both eyes were giving him pain, and he couldn't see out of the left one" as it was swollen shut." Compl. 7, ECF No. 126. NP Ball allegedly told him to wait a month or two for his symptoms to resolve. Edwards complains that NP Ball lied in her notes by failing to list his reports of pain from being in restraints and that she refused to prescribe pain medication. He alleges that NP Ball failed to refer him to see an optometrist and the regional physician. Edwards also states that NP Ball did not assess him for neurological deficits and that despite her lack of neurology expertise and her failure to conduct a proper examination of his condition, she reported that he had no acute neurological deficits and failed to refer him to see a neurologist.[4]

---

[4] Edwards also complains that NP Ball's affidavit submitted with the motion for summary judgment is not notarized. NP Ball later filed the properly executed and notarized signature page of her declaration on February 3, 2020. See ECF No. 117.

5

The court concludes that the evidence in the record as to the injuries and symptoms Edwards exhibited at Red Onion presents issues of fact for trial regarding the objective portion of the constitutional standard. Indeed, it is undisputed that after the altercation on November 27, 2018, nurses and a doctor at River North determined that Edwards' injuries warranted medical treatment there, in addition to follow up care at Red Onion. Jackson, 775 F.3d at 178. Moreover, Edwards describes his complaints of pain to NP Ball. Formica, 739 F. App'x at 755.

The court also concludes that on the current record, Edwards' evidence about NP Ball's treatment decisions and notes about the November 29, 2018, examination and thereafter, taken in the light most favorable to him, present material disputes of fact for trial on deliberate indifference. Clearly, NP Ball did not ignore Edwards' injuries that day. She performed and documented a thorough assessment of his condition and ordered X rays of his hand and face to assist in determining future treatment needs. However, despite Edwards' reports of widespread pain, NP Ball did not prescribe pain medication or other pain-relieving treatments. She also did not refer Edwards to the prison physician, an optometrist, or a neurologist regarding his pain, his obviously injured eyes, and his reports of numbness. According to Edwards, NP Ball merely advised Edwards to give these conditions time to resolve.

Records detailed herein indicate that NP Ball next evaluated Edwards two and a half months later, on February 14, 2019, for complaints in late January 2019 of continuing pain, numbness, and visual problems. When NP Ball examined Edwards, he was already on the list to

see the regional physician.[5]  NP Ball also referred him to the optometrist, but she did not provide treatment expressly designated to address his pain or numbness.  On March 4, 2019, an optometrist, Dr. Cline, evaluated Edwards for his vision complaints, diagnosed floaters in both eyes, and ordered follow up in one month.  At a second evaluation of Edwards on March 18, 2019, Dr. Cline reached the same diagnosis and prescribed two different eye drops.  Edwards saw the regional physician, Dr. Fox, on March 20, 2019.  Dr. Fox diagnosed Edwards' subjective hand complaints as chronic hand pain from dog bites received in November 2018 and, over the next several weeks, the doctor prescribed various pain medications for Edwards to try to address the issue.

Based on this evidence, the court finds disputes of fact on which Edwards may be able to persuade a jury that NP Ball knew that Edwards was suffering, and would continue to suffer, pain and possibly other visual or neurological effects because of her actions or inactions on November 29, 2018, and in the days and weeks thereafter.[6]  He may be able to show that NP Ball knew the care she provided at that first exam was inadequate to address some of his immediate and serious medical needs.  De'lonta, 708 F.3d at 526.  Moreover, Edwards may be able to show that he suffered prolonged, serious medical conditions because of NP Ball's decisions to delay treatment for pain, referral to the prison physician, and referral to specialists for treatment of his eyes and numbness.  "[D]elaying access to medical care" may constitute deliberate indifference.  See Smith

---

[5] Edwards contends that the defendants have misrepresented when he was placed on the list to see the regional physician.  This claim is contrary to the record, which indicates that Nurse Yates placed Edwards on the list to see the regional physician on January 30, 2019.  RN Witt informed him on February 5, 2019, that he was also on the list to see NP Ball, and Nurse Jessee informed him on February 11, 2019, that he was on the list to see the regional physician.  Before the doctor's appointment could occur, NP Ball saw and evaluated Edwards on February 14, 2019, and again on February 21, 2019, for flu-like symptoms.  These interim remedy form responses and examinations do not prove that during this time period, Edwards was not also on the list to see the physician, as the warden stated in a February 27, 2019, Regular Grievance response, as RN Witt informed him on March 4, 2019, and as Nurse Anderson informed him on March 19, 2019.

[6] Edwards alleges that in January 2019 he filed several requests for sick call that were ignored.  See Compl. 7, ECF No. 126.  He fails to state facts concerning the dates on which he filed these requests, the specific medical complaints they presented, or how NP Ball or RN Witt received notice of such complaints or requests.  Because Edwards fails to present evidence on which he could prove that these defendants, personally, were notified of or ignored any request for medical care during December 2018 or January 2019, the court has not construed the complaint as raising any such claim against them.

v. Smith, 589 F.3d 736, 739 (4th Cir. 2009) (citing Estelle, 429 U.S. at 104–05). In such cases, in addition to establishing that his medical need was objectively serious, a plaintiff must usually show that the delay in providing medical care caused him to suffer "substantial harm." See, e.g., Webb v. Hamidullah, 281 F. App'x. 159, 166 (4th Cir. 2008); Shabazz v. Prison Health Servs., Inc., No. 3:10CV190, 2012 WL 442270, at *5 (E.D. Va. Feb. 9, 2012). "The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." Shabazz, 2012 WL 442270, at *5 (citing other cases). Finding material factual disputes as to the alleged delays in treatment, based on the current record, the court will deny NP Ball's motion for summary judgment.

C.

Edwards contends that RN Witt denied him adequate medical care in the aftermath of the dog bite incident. Specifically, he accuses RN Witt of merely repeating, and thus covering up for, NP Ball's inaccurate reports finding that Edwards had no acute neuro deficits.

Two months after NP Ball's first evaluation of Edwards on November 29, 2018, the inmate filed an Emergency Grievance, received by the Red Onion medical staff on January 30, 2019. It stated: "My eye (left eye) has gone dim & I see white flashes in my right eye. My hands, wrist, leg & back all are numb of feeling. I sent numerous sick call request explaining this problem. I need medical attention." Mem. Supp. Mot. Summ. J. Ex. 1, Witt Decl. ¶ 32 and Attach. 39, ECF No. 109-1. A few hours later, nurse Yates evaluated Edwards and noted his report of continuing numbness and pain in his hands, legs, back, and face from the altercation in November 2018.[7] Nurse Yates' assessment found that Edwards was alert and oriented times three, his respirations were even and unlabored, and he had a stable gait to the cell door. Nevertheless, she referred him to NP Ball for evaluation and had him added to the "MD list." Witt Dec. Attach. at 40.

---

[7] Nurse Yates is not a defendant in this case.

Also on January 30, 2019, Edwards submitted an Informal Complaint, stating:

> . . . I put an Emergency Grievance in due to the fact I was experiencing the following medical problems—my left eye went dim (dark) I [am] seeing white flashes in my right eye, my back, wrist, hands are all numb of feeling. I had to stop nurse Yates & tell her that I needed medical assistance. She then stated she don't have time for this. I told her about the problems I was experiencing. She only took my temperature & blood pressure telling me she not going to do anything for me because I should of [sic] never put my hands on staff. I got a[n] x-ray that's it. I told her the x-ray is to see if bones are broken not nerve damage. She just repeated I should of [sic] never put my hands on staff. There isn't anything she could do. She not going to refer me to the doctor. She never checked none of the injuries I told her about. Camera footage supports this complaint. I am still in need of medical attention. This incident occurred between 2:20 p.m. and 2:30 p.m.

Id. at 41. On February 5, 2019, RN Witt responded to this Informal Complaint as follows: "You were assessed by D. Ball NP on 11/29/18. You were assessed on 1/30/19 by nurse Yates and you are on the list to see practitioner." Id.

On January 31, 2019, Edwards submitted a second Informal Complaint, complaining that nurse Yates had failed to provide him with medical treatment on January 30, 2019. On February 16, 2019, RN Witt responded to Edwards' complaint, stating: "Yates RN did a sick call on you on 1/30/19 and you are on list to see practitioner. 2/14/19—you were seen by D. Ball NP 2/14/19. No acute neuro deficits (altercation in 11/2018 @ RNCC). Refer to eye MD." Witt Decl. at ¶ 35 and Attach. at 42.

On January 31, 2019, at approximately 7:52 a.m., Edwards submitted an Emergency Grievance addressed to "Chief Warden/Asst Warden," complaining:

> Around 7:40-7:45 AM while D. Yates was conducting pill pass I told her I needed medical assistance for the following injuries: my left eye went dim, my right eye white flashes, and both of my hands and wrist[s], leg, thigh and back are numb of feeling. I was denied medical assistance. The above injuries constitute as immediate risks of serious personal injury and irreparable harm. I am still in need of medical assistance.

<u>Id.</u> at 43. On January 31, 2019, at approximately 10:20 a.m., nurse Yates responded to Edwards' Emergency Grievance, stating that his issues did not meet the definition for an emergency because he had already been assessed for these issues.

On February 7, 2019, Edwards submitted a Regular Grievance, repeating his complaints from the January 30, 2019, Informal Complaint. On February 16, 2019, in response to Edwards' Regular Grievance, RN Witt referred to her response to his related Informal Complaint. The Level I response to Edwards' Regular Grievance issued on March 5, 2019. It referenced RN Witt's responses about records indicating that Edwards had been assessed by nurse Yates on January 30, 2019; he was referred to be seen by the nurse practitioner; and he was examined by NP Ball on February 14, 2019, who noted that there were no acute neuro deficits present and referred him to the eye doctor. Based on these records, the Regular Grievance was ruled to be unfounded.

On February 11, 2019, at approximately 11:00 a.m., Edwards submitted an Emergency Grievance, stating:

> I am still suffering from the following injuries: my eye (left eye) is dimmer than the right and is starting to pain me. My right eye is having white flashes. My hands, wrist, back, leg and thigh are numb of feeling around the dog bites. Where the handcuffs were tighten[ed] around my wrist I been suffering from this since 11-28-18. It's been almost 2 weeks and I still haven't seen the L.P.N. for these problems.

<u>Id.</u> at 47. On February 11, 2019, at approximately 3:38 p.m., nurse Jessee responded that Edwards' grievance did not meet the definition for an emergency because he had already been assessed by a nurse and was on the list to see the doctor.

As stated, on February 14, 2019, at 9:48 a.m., NP Ball assessed Edwards for complaints stemming from the dog bite incident. Among other things, she tested his vision and examined his eyes. Because of Edwards' reports of occasional blurred vision, NP Ball referred him to an optometrist for evaluation. From her examination, NP Ball noted no acute neuro deficits and

indicated that Edwards should follow up as needed. Records indicated that Edwards was already on the list to see the regional physician.

> On February 27, 2019, Edwards submitted a Regular Grievance, stating:
>
> On 2-14-19 I was taken to Medical between 9:45AM-9:30AM to see [NP Ball]. I told her about the problem with my hands & wrist not having any feeling & giving me pain. She stated she is not worried about it. Told me to wait a month or two it should go away. She told me this on 11-29-18 & continue to keep telling me every time I see her this problem is becoming worse. I been scheduled to see an optometrist which is an eye doctor while the problem with my hands & wrist is being neglected. I'm being refused medical assistance for the noted problems.

Id. at 49. On March 4, 2019, RN Witt provided this information in response: "As I explain[ed] in prior request that if you were still having trouble to put in a request to see practitioner. I have placed you on the list to see regional practitioner but he only is here once or twice a month." Id. at 50. The Level I response, relying on this information from RN Witt, ruled the February 27, 2019, Regular Grievance to be unfounded. It noted that NP Ball had assessed Edwards for his medical complaints on February 14, 2019, and had not denied him medical treatment; that Edwards should follow up as needed; and that he was currently on the list to see the regional physician, Dr. Fox.

As to RN Witt, Edwards contends that she knew from his remedy forms of his complaints about pain, numbness, and eye problems, but took no steps to address his medical needs more appropriately. Edwards also complains that RN Witt never assessed or evaluated him to determine whether NP Ball was accurate in finding no acute neurological deficits. In addressing Edwards' written grievances and complaints, however, RN Witt reviewed and quoted from reports of the care provided—to ensure that Edwards' medical complaints had not been ignored and that a nurse, nurse practitioner, or doctor had examined him or was scheduled to do so soon. Moreover, Edwards offers no evidence that as a nurse, RN Witt has the medical expertise or authority to contravene or change a medical diagnosis or treatment order from a nurse practitioner like NP

Ball, who is licensed to perform different duties than a nurse. On the contrary, a nurse is entitled to rely on the prescriptions of a doctor or nurse practitioner as a more highly trained medical professional regarding the appropriate course of treatment for an inmate patient and cannot be found deliberately indifferent for doing so. See, e.g., Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) ("No record evidence suggests why [defendant] should not have been entitled to rely upon [prison's] health care providers' expertise" for appropriateness of evaluation or care previously provided to inmate), overruled on other grounds by Farmer v. Brennan, 511 U.S. 825, 840 (1994); Ames v. Sidi, No. 3:16CV781, 2019 WL 5685585, at *4 (E.D. Va. Oct. 31, 2019) (finding nurse "is entitled to rely upon the medical judgment of a doctor as to the proper course of treatment for an inmate") (citing other cases).

For the stated reasons, the court cannot find any genuine issue of disputed fact on which Edwards could persuade a jury that RN Witt's challenged actions constituted deliberate indifference to any serious medical need. Accordingly, the court will grant summary judgment for RN Witt.

### III.

For the stated reasons, the court will grant summary judgment as to the claims against RN Witt, but will deny summary judgment as to the claims against NP Ball.[8] As stated, the court will dismiss the motion to dismiss as subsumed in the defendants' summary judgment motion. An appropriate order will be entered herewith.

The court will send a copy of this memorandum opinion and the accompanying order to plaintiff and counsel of record for the defendants.

**ENTER**: This ___30th___ day of October, 2020.

                                            */s/ Glen Conrad*
                                            Senior United States District Judge

---

[8] The pending motions by defendant Parks will be addressed in a separate opinion and order.