IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| MICHAEL DERRICK EDWARDS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:19cv00324 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| WHITE, *et al.*, | ) | By:  Hon. Thomas T. Cullen |
| | ) |       United States District Judge |
| Defendants. | ) | |

Michael Derrick Edwards, a Virginia inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983. This matter is set for a jury trial and is currently before the court on Edwards's partial motion for summary judgment against defendants White, J. Murray, Musick, and Blevins (the "defendants"),[1] concerning his allegations that his rights were violated when he was placed and kept in five-point restraints following an altercation at River North Correctional Center ("River North"). Having reviewed the record, the court will deny Edwards's motion.

I.

Edwards filed this action against several security staff members and medical personnel, related to a November 2018 incident when officers used force against Edwards and later placed him in five-point restraints. The allegations underlying this action have been recounted in numerous court opinions and orders (*see, e.g.*, Mem. Op. pgs. 1–5, Mar. 10, 2020 [ECF No.

---

[1] Edwards names other defendants in this action but only moves for summary judgment against these four. Throughout this opinion, the court uses the term "defendants" only in reference to those defendants against whom Edwards seeks summary judgment.

136]; Mem. Op. pgs. 1–4, Oct. 30, 2020 [ECF No. 215]) and the court will not fully repeat them here. Instead, the court will briefly summarize the evidence relevant to Edwards's partial motion for summary judgment.

It is undisputed that on November 27, 2018, Edwards was involved in an altercation with staff that resulted in him being bitten by a canine in several places and ultimately placed in five-point restraints for nearly 16 hours. How the incident arose is in dispute. Edwards claims that an officer initiated the altercation by pushing Edwards into a fence, "face first." (Second Am. Compl. at 4 [ECF No. 126].) According to the audio recordings of Edwards's resulting disciplinary charge hearings, the altercation commenced when Edwards was "verbally abusive," "aggressive," failed to comply with orders, and "struck" an officer "multiple times with a closed fist to the face." (Disciplinary Audio Recording RNCC-2018-1399 & 1405 [ECF No. 300].) Edwards claims that he only "punched" one officer in the face in order to "defend" himself. (Second Am. Compl. at 4.) The disciplinary hearing audio recordings reflect, however, that Edwards struck and kicked multiple officers and canines. (Disciplinary Audio Recordings RNCC-2018-1399−1405 [ECF No. 300].)

In any event, there is no dispute that, during the incident, officers deployed a canine to subdue Edwards, and Edwards suffered wounds to his back. Edwards claims, though, that the wounds were "open wounds" (2d Am. Compl. at 5), while medical staff counters that the two wounds on his back were "superficial lacerations—not open/gaping wounds" (*see, e.g.*, Decl. of Teresa Payne, R.N. ¶ 39, June 4, 2021 [ECF No. 253-3]). The defendants assert that Edwards "was restrained after [he] failed to submit to officer commands and after he had

punched officer(s)," and that they did not use "any force greater than what was necessary, excused, or justified" to restrain Edwards. (Answer ¶ 20 [ECF No. 162].)

There is no dispute that after the altercation, Edwards received medical treatment; indeed, video footage submitted by the defendants shows that Edwards was transported to the medical department by at least 14 officers. (Video RNCC_112718_1408577_7 [ECF No. 209].) Disciplinary hearing audio recordings reflect that Edwards assaulted an officer by kicking him in the knee during this transport. (Disciplinary Audio Recordings RNCC-2018-1406 [ECF No. 300].) Edwards states that while in the medical department, he "never resisted or needed to be restrained at any point." (Second Am. Compl. at 5.) The video evidence shows that while Edwards was in the medical department, he was always surrounded by between four and seven officers. (*See* Videos RNCC_112718_1408577_1 & RNCC_112718_1408577_6 [ECF No. 209].) After receiving medical treatment, Edwards was placed in five-point restraints at approximately 5:20 p.m. (Video 11-27-18 CAMERA 59 MED ISO 2 [ECF No. 209].) Edwards asserts that Capt. Blevins made the decision to place him in five-point restraints. (Second Am. Compl. at 5.)

After the restraints were secured, Nurse Parks inspected the restraints and determined that there were "no contraindications for the restraints and [that] no restraints were placed over any of [Edwards's] wounds." (Decl. of Lisa Parks, RN ¶ 11, Jul. 16, 2020 [ECF No. 187-1].) Edwards claims that, approximately 20 minutes after his placement in the restraints, Assistant Warden White and Capt. Blevins entered the cell where Edwards was restrained to ask him about what had happened. Edwards argues that Assistant Warden White failed to order his release from the five-point restraints even though the "immediacy of the disturbance

was at an end" and Edwards did not "exhibit[] any threatening behavior to the safety and security of himself, the nurses, or the officers" immediately before his placement in the restraints. (Second Am. Compl. at 6.) The court notes that video evidence shows that from the time of the initial altercation to the time he was placed in five-point restraints, Edwards had between 4 and 14 officers surrounding him.

Edwards asserts that around 6:20 p.m., approximately one hour after his placement in the restraints, Officers Musick and J. Murray came to Edwards's cell and asked if he wanted a restraint break. Edwards states that although he said he wanted a break, the officers "turned to the camcorder and stated that [Edwards] refused" the break.[2]

Video evidence shows that at 8:34 p.m., an officer offered Edwards a restraint break. (Video RNCC_112718_1408577_2 [ECF No. 209].) Although Edwards cannot be seen in the video, the officer indicates that Edwards refused the break. (*Id.*)

At 9:00 p.m., a nurse "performed a shift assessment and restraint assessment on" Edwards and noted that he "refused to be released from the five-point restraints at that time." (Parks Decl. ¶ 15.)

Video evidence also shows that at 10:34 p.m., officers entered Edwards's cell because he had "wiggled out" of his chest strap. (Video RNCC_112718_1408577_3 [ECF No. 209].) The officers re-adjusted the strap and a nurse re-checked the restraints for proper application. (*Id.*) Also during this encounter, Edwards asked to use the bathroom, but his request was denied. (*Id.*)

---

[2] The court notes that there is no video evidence in the record associated with this alleged 6:20 p.m. interaction.

At 1:00 a.m. on November 28, a nurse performed a "neurology check" and documented that Edwards was able to "move all extremities and there were no complaints of pain or distress." (Parks Decl. ¶ 16.)

Video evidence shows that at 3:10 a.m. on November 28, Edwards was offered another restraint break, and this time he accepted the offer. (Video RNCC_112718_1408577_4 [ECF No. 209].) During the restraint break, he also used the bathroom. At 3:20 AM, a nurse performed a "restraint assessment and neurology check" and documented that Edwards was "able to move all extremities." (Parks Decl. at ¶ 17.) The nurse noted that the five-point restraints were "released" for "range of motion purposes" and then "appropriately" reapplied. (*Id.*)

Finally, video evidence shows that at 9:00 a.m., just under 16 hours from the initial application, Edwards was released from the five-point restraints for "preparation for transfer to Red Onion [State Prison]." (Video RNCC_112718_1408577_5 [ECF No. 209].)

In support of his partial motion for summary judgment against defendants White, J. Murray, Musick, and Blevins, Edwards argues that the defendants subjected him to cruel and unusual punishment by placing him five-point restraints while he had "open wounds" on his back and keeping him there even though he was not a threat to himself or anyone else. Edwards also contends that the officers only gave him one break. Finally, Edwards argues that although two of the defendants were present for 12 hours of his confinement in the restraints, he was given "no process."

## II.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). But if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted). In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World*

*Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

### III.

Edwards argues that he is entitled to summary judgment against the defendants concerning his claims that his placement and continued confinements in five-point restraints violated the Eighth Amendment. The court concludes that genuine disputes of material facts preclude summary judgment and Edwards has not shown that he is entitled to judgment as a matter of law.

The Eighth Amendment prohibits prison officials from inflicting unnecessary and wanton pain and suffering on prisoners. *Whitley v. Albers*, 475 U.S. 312, 320−21 (1986). To determine whether a prisoner has stated a cognizable excessive force claim, the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Whether force was necessary or intentionally aimed at inflicting unnecessary physical harm depends on factors such as the need for the application of force, the relationship between the need and the amount of force used, the extent of injury inflicted, the extent of the threat to the safety of staff and inmates reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. *Whitley*, 475 U.S. at 321; *see, e.g., Wilkins v. Gaddy*, 559 U.S. 34, 37−39 (2010).

To establish cruel and unusual living conditions, a prisoner must prove that "the deprivation of [a] basic human need was *objectively* sufficiently serious," and that "*subjectively* the officials acted with a sufficiently culpable state of mind." *Strickler v. Waters*, 989 F.2d 1375,

1379 (4th Cir. 1993) (emphasis in original) (cleaned up). Only extreme deprivations are sufficient to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement. *See Hudson v. McMillian*, 503 U.S. 1, 8−9 (1992). A prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993); *Strickler*, 989 F.2d at 1381.

The subjective component of a challenge to conditions of confinement is satisfied by a showing of deliberate indifference by prison officials. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Deliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. Instead, it requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. *See id.* at 837; *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

The use of five-point restraints in a good-faith effort to control an inmate is not *per se* unconstitutional. *See Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996); *Sadler v. Young*, 325 F. Supp. 2d 689, 702 (W.D. Va. 2004), *rev'd on other grounds*, 118 F. App'x 762 (4th Cir. 2005). But courts have found that continued restraint of this type, without legitimate purpose, can give rise to a constitutional violation. *See Williams*, 77 F.3d at 763; *Sadler*, 325 F. Supp. 2d at 702. "[When] the immediacy of the disturbance [i]s at an end . . . the unnecessary infliction of continued pain throughout a prolonged time period clearly supports an inference that the guards were acting to punish, rather than to quell the disturbance." *Williams*, 77 F.3d at 765

(citing *United States v. Cobb*, 905 F.2d 784, 789 (4th Cir. 1990) ("[P]unitive intent behind a defendant's use of force may be inferred when the force is not reasonably related to a legitimate nonpunitive governmental objective.") (cleaned up)). As such, continued use of five-point restraints on an inmate who does not currently pose any threat to security or discipline can violate the Eighth Amendment, even when that inmate does not suffer significant physical injuries. *See Sadler*, 325 F. Supp. 2d at 704; *Davis v. Lester*, 156 F. Supp. 2d 588, 594 (W.D. Va. 2001).

Here, Edwards asserts that he was not a threat at the time he was placed in five-point restraints or at any other point during his 16-hour confinement, that he should not have been placed in five-point restraints with "open wounds" on his back, and that he was denied all but one break from the restraints. Based on the audio and video recordings in the record, however, a reasonable jury could conclude that Edwards displayed dangerous and disruptive behavior during the altercation and during his transport to the medical department. During the times when Edwards appeared calm and quiet on the video recordings, he was in restraints and surrounded by several security staff. A reasonable jury could also conclude that his attempt to "wiggle[] out" of his restraints during his confinement demonstrated that his continued confinement was justified.

As to his back wounds, medical staff attests that the wounds were "superficial lacerations" and "not open/gaping wounds." Nurses checked Edwards's five-point restraints immediately after they were applied and multiple times throughout the night and confirmed that they were properly applied, that there were "no contraindications for the restraints," and that the restraints were not placed over any of his wounds. Based on this evidence, a reasonable

jury could conclude that the restraints were not improperly applied because of his back wounds.

Finally, affidavits and video evidence submitted by the defendants reflect that Edwards was offered at least two breaks that he refused to take and that he took at least one break during his 16 hours in the restraints overnight. Although Edwards asserts that the defendants lied about offering him breaks, that critical fact is in dispute, and a reasonable jury could conclude that the defendants did not act with deliberate indifference.

Having reviewed the record as a whole and drawing all reasonable inferences in the light most favorable to the defendants, the court concludes that there are genuine issues of material facts, and that Edwards has not shown that he is entitled to judgment as a matter of law.

## IV.

Edwards also argues that two of the defendants denied him due process during his confinement in five-point restraints. Specifically, he argues that although two of the defendants were there for 12 hours of his confinement in the restraints, he was given "no process." The court concludes that material disputes of genuine facts preclude summary judgment and Edwards has not shown that he is entitled to judgment as a matter of law.

The Due Process Clause of the Fourteenth Amendment requires states to provide procedural rules to protect persons against mistaken deprivations of life, liberty, or property. *Carey v. Piphus*, 435 U.S. 247, 259 (1978). Liberty interests can arise from two sources: the Due Process Clause itself and state law. *Sandin v. Conner,* 515 U.S. 472, 484 (1995). The Due Process Clause may create a liberty interest when the restraint imposed upon an inmate exceeds his

sentence in an "unexpected manner." *Id.* State prison rules may also create liberty interests that are protected by the Due Process Clause when they "impose[] [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484−86 (holding that prisoner has no state-created liberty interest in being free from segregated confinement because it does not constitute an atypical, significant deprivation).

In *Williams,* the court acknowledged that an inmate's transfer from administrative segregation to "total immobilization in [four-point] restraints surely 'work[ed] a major disruption in his environment.'" 77 F.3d at 759, 769−70 (quoting *Sandin,* 515 U.S. at 486). While the court rejected the plaintiff's due process argument for other reasons, it held that an inmate has some "liberty interest" in not being confined in immobilizing restraints:

> Simply because the initial application of the restraints occurred soon after a disturbance does not mean that four-point restraints may be imposed indefinitely. At some point in time, an inmate so restrained would be entitled to some procedural protection to ensure that his liberty interest was not being arbitrarily and capriciously denied. In this appeal, we decline to resolve where that point exists.

77 F.3d at 770 n.10. Although the Fourth Circuit has held that inmates have a "liberty interest" in not being "arbitrarily and capriciously" confined in immobilizing restraints, it has yet to determine precisely when the process to protect that liberty interest is due. *Sadler v. Young*, 325 F. Supp. 2d 689, 705 (W.D. Va. 2004); *see also Card v. D.C. Dept. of Corrections*, No. 2:00CV631, 2005 WL 2260167, at *8 (E.D. Va. Sept. 13, 2005) (noting that, "[a]t some point in time," an inmate in five-point restraints "would be entitled to some procedural protections to ensure that his liberty interest was not being arbitrarily and capriciously denied").

There is no dispute that Edwards was placed in five-point restraints as a consequence of the alleged violent altercation with staff. At a minimum, Edwards admits that he struck at least one officer. Based on the video and audio evidence in the record, the court finds that a reasonable jury could conclude that Edwards's initial placement in five-point restraints was justified. *Williams*, 77 F.3d 756, 769−70 (4th Cir. 1996) (citing *Lunsford v. Bennett*, 17 F.3d 1574, 1583 (7th Cir. 1994) ("Pre[-]deprivation protections [cannot] reasonably be applied to a prison disturbance situation where institutional security is threatened."); *Albers v. Whitley*, 546 F. Supp. 726, 732 n.1 (D. Ore. 1982)).

Whether Edwards was entitled to some process and what that process might have looked like over the next 16 hours is not clear. Edwards does not specify what sort of procedural protections were required. His confinement in restraints lasted through the night (from 5:20 p.m. to 9:00 a.m.). The video evidence shows that at 10:34 p.m., approximately five hours into his confinement, Edwards attempted to wiggle out of the restraints. The court finds that a reasonable jury could conclude that no hearing was possible during that period because the period ended as soon as officers determined that Edwards's behavior was sufficiently compliant for him to be released. Further, Edwards has not alleged that his post-deprivation state remedies were inadequate. *See Williams*, 77 F.3d at 769-70 (recognizing that when prison security emergency precludes pre-deprivation process, post-deprivation procedural protections are adequate).

Having reviewed the record as a whole and drawing all reasonable inferences in the light most favorable to the defendants, the court concludes that there are genuine issues of

material facts and that Edwards has not shown that he is entitled to judgment as a matter of law, precluding summary judgment on his due process claim.

## V.

For the reasons stated, the court will deny Edwards's motion for summary judgment. This matter will proceed to trial as scheduled.

The Clerk is directed to send copies of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 19th day of September, 2022.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE